## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAMSTERS LOCAL 456 ANNUITY FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>WPP PLC, MARK READ, JOANNE WILSON, and BRIAN D. LESSER,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Teamsters Local 456 Annuity Fund ("Local 456 Annuity" or "Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by WPP plc ("WPP" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (as defined herein).

## **<u>NATURE OF THE ACTION</u>**

1.      This is a federal securities class action on behalf of all persons and entities that purchased WPP American Depositary Receipts ("ADRs") between February 22, 2024 and July 8, 2025, inclusive (the "Class Period") against WPP and certain of its officers and executives, seeking

to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      WPP is a global advertising conglomerate based in the United Kingdom. In 2020, following years of growth through acquisitions, WPP embarked on a years-long transformation aimed at realizing operational and strategic synergies to generate financial growth. As part of this transformation, WPP sought to simplify operations within its media arm, WPP Media, which was formerly known as GroupM until its rebrand in May 2025. In January 2024, before the Class Period, then-Global Chief Executive Officer ("G-CEO") of GroupM Christian Juhl ("Juhl") assured investors that the most recent iteration of WPP's transformation, including simplification of GroupM, paved "a clear path to be #1 in every market that we are around the world."

3.      This action alleges that Defendants misrepresented the status of WPP's transformation and the simplification strategy for WPP Media. In reality, and undisclosed to investors, WPP never had an effective or cohesive strategy to transform itself. In fact, WPP's efforts to transform itself led to internal disruptions that hindered the Company's ability to generate new business and resulted in an exodus of highly material clients.

4.      The truth was revealed to investors on July 9, 2025, when WPP provided a First Half 2025 Trading Update and admitted its disappointing results and guidance were the result of "lower net new business." Chief Executive Officer ("CEO") Mark Read ("Read") further admitted that the Company's transformation restructuring actions led to "some distraction to the business" that resulted in a "deficit of new business opportunities." Analysts immediately described the disappointing results as "WPP specific." On this news, the price of WPP ADRs fell $6.48 per ADR, or about 18%, to a closing price of $29.34 per ADR on July 9, 2025.

5.      As a result of Defendants' wrongful acts and omissions, and the resulting decline in market value of the Company's ADRs when the truth was disclosed, Plaintiff and other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Defendant WPP's U.S. headquarters are located in this District and many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this Judicial District, as the ADRs that are the subject of this action are traded on the New York Stock Exchange ("NYSE") in this Judicial District.

9.      In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

10.      Based in Elmsford, New York, Plaintiff Teamsters Local 456 Annuity Fund is a defined contribution plan.  Plaintiff manages approximately $238 million in assets for the benefit of more than 6,500 participants.  As set forth in the accompanying certification, incorporated by

reference herein, Plaintiff purchased WPP ADRs during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

11.     Defendant WPP is incorporated under the laws of Jersey, United Kingdom with its principal executive offices in London, United Kingdom, and its United States headquarters located at 3 World Trade Center, 175 Greenwich Street, New York, NY 10007.  WPP ADRs trade on the NYSE under the ticker symbol "WPP."

12.     Defendant Mark Read was, at all relevant times, Chief Executive Officer and Executive Director of WPP.

13.     Defendant Joanne Wilson ("Wilson") was, at all relevant times, Chief Financial Officer ("CFO") and a Director of WPP.

14.     Defendant Brian D. Lesser ("Lesser") was, at all relevant times, the Global Chief Executive Officer (G-CEO) of GroupM/WPP Media.

15.     Defendants CEO Read, CFO Wilson, and G-CEO Lesser (collectively, the "Individual Defendants"), because of their positions with WPP, possessed the power and authority to control the contents of, among other things, WPP quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of WPP's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being

made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

16.    WPP and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.    WPP provides advertising, media management, consultancy, public relations, and branding and identity services globally.  As a part of WPP's Global Integrated Agencies segment, WPP Media utilizes data analytics and artificial intelligence ("AI") to create, plan, and buy integrated media campaigns for its global clients.  In May 2025, the Company launched WPP Media as a rebrand of GroupM, which historically represented one of the top three earnings divisions within the Global Integrated Agencies segment.

18.    Prior to the Class Period in 2020, after WPP had become the world's largest advertising company through numerous acquisitions of smaller media companies, the Company launched a years-long effort to transform itself by generating operational and strategic synergies. The strategic transformation included the simplification of WPP Media, formerly known as GroupM.

19.    Leading up to the Class Period, during WPP's investor day conference on January 30, 2024, the Company announced the most recent iteration of its strategy to transform WPP, referred to as "Innovating to Lead," which included "the continued process of simplification at GroupM with the launch of Synergy 3.0[.]"

20.    During the conference call, G-CEO Christian Juhl claimed that, among other things, GroupM had "a clear plan to be #1 in every market that we are around the world."  He further

assured investors that "[w]e've got a simple operating model. It's been in progress for 5 years. This is not something new. There's no big bump that's going to hit along the road for that."

**<u>Defendants' Materially False and Misleading Statements</u>**

21.     The Class Period begins on February 22, 2024. That day before markets opened, WPP issued a press release announcing its preliminary results for the fourth quarter and full year of 2023. In the press release, WPP touted its growth strategy, *i.e.*, Innovating to Lead, which was built on the following "four strategic pillars":

> 1.     Lead through AI, data and technology, by building on our leadership position in the application of artificial intelligence through the acquisition of the AI research firm Satalia in 2021; organic investment in WPP Open, our AI-driven platform, client technology and data; and deep partnerships with strategic technology partners such as Adobe, Google, IBM, Microsoft, Nvidia and OpenAI. Our plans include annual cash investment of around £250m in proprietary technology to support our AI and data strategy
>
> 2.     Unlock the full potential of creative transformation to drive growth, expanding our client relationships by further leveraging WPP's global scale, integrated offer in creative, media, production and PR, and capabilities in growth areas such as commerce, influencer marketing and retail media to capture share in a growing market
>
> 3.     Build world-class, market-leading brands through our six powerful agency networks – VML, Ogilvy, AKQA, Hogarth, GroupM and Burson – which now represent close to 90% of WPP's revenue less pass-through costs, and in particular reap the benefits of unrivalled scale from VML as the world's largest integrated creative agency, leverage GroupM's simplified operating model and scale as the world's largest media agency and establish Burson as a leading global strategic communications agency by bringing together BCW and Hill & Knowlton
>
> 4.     Execute efficiently to drive strong financial returns, by delivering growth and structural cost savings from the creation of VML and Burson, and simplification of GroupM, unlocking scale advantages and further efficiency savings

22.    In the same press release, CEO Read touted WPP's growth prospects, stating, "We are optimistic about the strategic opportunities ahead of us and are confident that we can deliver accelerated and increasingly profitable growth over the medium term."

23.    During the question-and-answer portion of the related earnings call, a UBS Investment Bank analyst asked if the decelerating growth of GroupM was "due to account losses versus cuts from [WPP's] existing clients."  In response, CEO Read boasted that "we really only had one significant client loss last year. . . .  But I'd say in the main, we had a good new business performance overall with that exception."

24.    On April 25, 2024, WPP issued a press release announcing its financial results for the first quarter of 2024.  The press release stated that WPP had made "strong progress on the strategic initiatives laid out" in January 2024, and that "GroupM" was "on track to deliver targeted in-year savings and well-placed to benefit from a strong pipeline."  In addition, in the press release, CEO Read again assured investors that "GroupM is progressing well with its simplification. . . . I'm very pleased with the progress we are making[,] and we are already seeing the benefits of a simpler and more agile structure for our clients."  CEO Read further claimed that WPP "remain[s] on track to return to growth in the balance of the year, supported by an encouraging new business pipeline and the strength of our business creatively and in media . . . while our simpler structure will drive organisational flexibility and stronger cash conversion."

25.    WPP held a related earnings call that same day, during which CEO Read reiterated that "our new simpler organization is both enabling us to move faster and in a more coordinated fashion and enabling the deployment of these AI tools across our organization."  CEO Read also touted the progress the Company had made in executing its Innovating to Lead growth strategy,

highlighting that WPP "set out [four] objectives" and was "making very good progress against each of them."

26.     During the question-and-answer portion of the same earnings call, a UBS Investment Bank analyst asked about the "turnaround in GroupM in North America" and whether there was "any evidence" of improvement so far this year."

27.     CEO Read responded, in relevant part, stating:

> And I think in GroupM in North America, we've made a leadership change, I think, back in February. And I think we need to see the impact that, that will make, as well as the organizational changes as well as our investments in data. And I think over the course of the year, we will see an improvement in the new business performance and really your second and third question are quite linked. So[,] I think we have a really strong business in GroupM and we're all very focused on doing all we can to improve the performance there.

28.     Later during the same earnings call, a Barclays analyst asked about the progress of strategic initiative for GroupM. In response, CFO Wilson again assured investors that, although "GroupM is a more complicated initiative," it is "absolutely on track."

29.     On August 7, 2024, WPP issued a press release announcing its financial results for the second quarter and first half of 2024. In the press release, CEO Read stated:

> I am very pleased with the progress we have made in the past six months against each of our strategic objectives, particularly our continued investment in AI, the creation of VML and Burson, and the simplification of GroupM. We are strengthening our offer for clients while building a more efficient company.

30.     During the related earnings call held later that day, CFO Wilson continued to emphasize that WPP had, among other initiatives, "made very strong progress" with respect to "the simplification of GroupM." CFO Wilson further elaborated on the purported progress of the simplification of GroupM, stating:

> GroupM has implemented its new market operating model, simplifying support functions and integrating growth and marketing

efforts as well as GroupM's go-to-market strategy under one leader. Strong progress has been made on both structural cost actions and our global media platform, Open Media Studio, which brings together key media tools, simplifying our global property position and consolidating our investment. Execution of the GroupM plan will continue through the second half, with all related cost actions completed in 2024.

31.    Later during the same earnings call, while acknowledging that "GroupM had a tougher time in new business, particularly in the U.S. for the past 18 months," CEO Read reassured investors that WPP "expect[s] the combined effect of these initiatives to reverse this[,]" enabling "WPP to start winning again in this critical market."

32.    On October 23, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024, in which CEO Read boasted that GroupM was experiencing a renewed business strength, stating:

> Most importantly, we returned to form in new business, winning Amazon's media account outside the Americas and securing our media relationship with Unilever, including taking back the retail media and activation business in the United States. Our success with two of the world's top ten advertisers demonstrates the renewed competitiveness of our offer. We are also proud to be supporting the new Starbucks leadership team with our recent creative win in the United States.

33.    In that same press release, CEO Read again reiterated that, among other initiatives, GroupM was "delivering a stronger business and structural cost savings."

34.    During the related earnings call, CEO Read again assured investors that WPP "continue[s] to make very good progress on building a simpler, more efficient company through the simplification of GroupM[,]" in addition to other initiatives. He further claimed that "[f]or GroupM, you can see the results of the simplification, greater sharing of resources and the impact of WPP Open in terms of new business performance."

35.     During the same earnings call, CEO Read further elaborated on the purported progress and success related to the strategic initiatives of GroupM, boasting that the winning of Amazon.com, Inc.'s media account outside of the Americas "demonstrate[s] the depth[,] breadth[,] and strength of GroupM's media business globally."

36.     On February 27, 2025, WPP issued a press release announcing its preliminary financial results for the fourth quarter and full year of 2024, in which CEO Read continued to claim that WPP had "achieved significant progress against [its] strategy in 2024 with the creation of VML, Burson and the simplification of GroupM[.]"

37.      During the question-and-answer portion of the related earnings call, and in response to a Deutsche Bank analyst inquiring into why growth had faltered in the fourth quarter, G-CEO Lesser stated:

> In terms of where we are on our journey and when we'll be sort of satisfied with our go-to-market, we have some more work to do in terms of simplifying the GroupM organization.   Our client expectation is that we bring them the best of the group in every engagement.  But we're -- in terms of our go-to-market, we're there now.  I mean we are competing effectively.  We are winning pitches. We are building businesses with our clients.  We have everything we need to compete, win and retain clients now.  The only constant in this industry is change.  So[,] you'll see us evolve, but that's the expectation of our clients.

38.     On April 25, 2025, WPP issued a press release announcing its financial results for the first quarter of 2025.   In the press release, while attributing GroupM's weak first quarter performance to the "impact of historical client losses[,]" WPP stated that, "[u]nder the leadership of [G-CEO] Brian Lesser[,] the business is building on and accelerating the simplification plan laid out in January 2024."

39.     That same day, the Company held a related earnings call, during which CEO Read stated, "In February, we talked about 3 specific actions: drive further adoption of WPP, we're

seeing good growth in that, strengthen the GroupM proposition and get GroupM back to growth [indiscernible] InfoSum and importantly, win more new business."  He added that "I do think there's some encouraging signs of progress on all of these 3 fronts."

40.    During that same earnings call, CEO Read informed investors that GroupM had continued to make progress on gaining new business, explaining:

> [I]n terms of new business, it is lumpy, but I do think we're making progress.  The loss of the Coca-Cola North American media business in the quarter was difficult, but we do have a very detailed debrief from the client and a good understanding of our strengths and challenges.  We're making good progress towards renewing our broader agreement with that client.  Meanwhile, in the first quarter, there are some important tangible signs of success, whether it be the win of the media mandate for EA, Godrej Consumer Products in India, the global consumer shopping market for Heineken and many, many other new business pitches, which are less public, but work through the system, including expansion of scope from our existing clients, which you do see in the results of our top 10 and top 25 clients.  And an important common thread across all of this is WPP Open.  We are putting that at the heart of what we're doing.

41.    Then, on May 28, 2025, WPP issued a press release announcing the launch of WPP Media, replacing GroupM as the name of WPP's global media company.  In the press release, CEO Read stated:

> We believe that WPP is the strongest marketing partner for the world's leading brands in the AI era, where technology and talent converge.  The move to WPP Media continues our strategy to simplify and integrate our offer for clients.  While GroupM was built for a time when media scale mattered most, WPP Media reflects the power of AI, data and technology and simpler, more integrated solutions.  Our vision for the future is clear – marketing that is informed by data, led by seamlessly connected teams of brilliant people, and full of new opportunities for our clients.

42.    On June 9, 2025, WPP issued a press release announcing that CEO Read "will retire from the Board and as CEO on 31 December 2025."

43.    The above statements set forth above in ¶¶ 21-42 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose that: (1) WPP did not have a coherent strategy to execute the simplification and transformation of WPP, particularly WPP Media; (2) the Company's strategy to transform and simplify WPP Media led to significant internal disruptions; (3) such internal disruptions rendered WPP unable to effectively generate new business and resulted in an exodus of large clients of WPP; and (4) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Is Revealed**

44.    On July 9, 2025, before markets opened, the truth was revealed when WPP issued a press release announcing its First Half 2025 Trading Update, reporting revenue less pass-through costs to be roughly £5 billion, which implies a like-for-like decline of 5.5% to 6% in the second quarter of 2025.  Additionally, WPP lowered its full-year 2025 guidance for like-for-like revenue less pass-through costs to a year-over-year decline of 3% to 5% (from flat to a decline of 2%), which missed analysts' estimates of a 1.2% decline.  In the press release, CEO Read disclosed that, "[s]ince the start of the year, we have faced a challenging trading environment with macro pressures intensifying and lower net new business."

45.    During the related earnings call that same day, CFO Wilson explained that WPP had seen "a deterioration in performance as the second quarter progressed with, first, a greater degree of caution on client spending than expected[,] and secondly, weaker net new business." CFO Wilson further stated that WPP had "seen the most significant quarter-on-quarter impact in WPP Media and Ogilvy, reflecting a pullback in client spending[,]" while explaining that WPP

Media was negatively affected by "one-off factors" and "a quicker ramp down of the [first quarter] client loss."

46.     During the same earnings call, CEO Read admitted that "the implementation of the new strategy for WPP Media, I would say, is going well, but we're clearly not yet seeing that translate into better business performance."  Additionally, CEO Read acknowledged that restructuring actions previously taken with respect to WPP Media had led to "some distraction to the business" that resulted in a "deficit of new business opportunities[.]"

47.     During the question-and-answer portion of the same earnings call, a Bank of America analyst asked whether June 2025 "was indeed the worst month during the [second] quarter[,]" and questioned the prudence of WPP's full-year 2025 guidance.  In response, CFO Wilson stated:

> Okay.  Let me start there.  Look, what we saw was a weakening in client sentiment from the start of the quarter, but we didn't see a material step down in spend and like-for-like performance was broadly in line with expectations and very much within our guidance range.  Performance did deteriorate through the quarter, particularly in June.  It was really driven by 3 factors as we do progress through the quarter, we saw deeper client spending impacts than we saw in prior months.  That was particularly in CPG and auto.  Net new business was lower than expected.
>
> We saw Coke North American Media rolling off as we went through the quarter.  And then there were one-off factors which impacted June's net sales performance as well and impacted the Q2 like-for-like overall.  So[,] look, I think, it's -- June, of course, performance is a consideration, but it's important to look at the quarter as a whole.  Certainly, the performance through the quarter has made us more cautious.  And at the lower end of that guidance, it does assume an H2 deterioration versus H1 and a deterioration in the underlying Q2 like-for-like.

48.     On this news, the price of WPP ADRs fell $6.48 per ADR, or about 18%, from a closing price of $35.82 per ADR on July 8, 2025, to a closing price of $29.34 per ADR on July 9, 2025.

49.     The following day, on July 10, 2025, WPP announced the appointment of Cindy Rose as WPP's new CEO, effective September 1, 2025, to replace CEO Read, who was stepping down also effective September 1, 2025.

50.     Analysts immediately reacted to the news.  For example, Barclays analysts reduced their price target by 27% and described the disappointing results and guidance as a "WPP-specific issue," and that "[t]he situation around the impending CEO change could suggest that this is more WPP-specific[.]"

51.     Additionally, J.P. Morgan analysts lowered their price target and reported that "WPP has issued a profit warning this morning cutting both Q2 and FY25 guidance after a weaker than expected June[,]" as WPP "cited increased macro uncertainty . . . and weaker net new business momentum with less wins, more losses (including Coke, Paramount and Mars) than expected." The analysts echoed the Barclays sentiment, reporting, "We believe that the Q2 deterioration is largely WPP specific[.]"

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased WPP ADRs between February 22, 2024 and July 8, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class.  Throughout the Class Period, WPP ADRs actively traded on the NYSE (an open and efficient market) under the symbol "WPP."  Millions of WPP shares were traded publicly during the Class Period on the NYSE.  As of December 31, 2024, the Company had more than 98 million ordinary shares outstanding, represented by more than 19 million American Depositary Shares (ADSs), which are evidenced by American Depositary Receipts (ADRs) or held in book-entry form.  Record owners and other members of the Class may be identified from records maintained by WPP or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

54.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

56.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of WPP;

d)     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of WPP;

e)     whether the market price of WPP ADRs during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

57.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

<u>**UNDISCLOSED ADVERSE INFORMATION**</u>

58.    The market for WPP ADRs was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, WPP ADRs traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased WPP ADRs relying upon the integrity of the market price of the Company's shares and market information relating to WPP and have been damaged thereby.

59.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of WPP ADRs, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about WPP's business, operations, and prospects as alleged herein.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's ADRs to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's ADRs at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

60.     As alleged herein, Defendants acted with scienter in that Defendants: knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

61.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding WPP, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning WPP, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

62.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

63.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of WPP who knew that the statement was false when made.

## LOSS CAUSATION

64.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

65.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of WPP ADRs and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of WPP ADRs fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

66.     The market for WPP ADRs was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, WPP ADRs traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's ADRs relying upon the integrity of the market price of WPP ADRs and market information relating to WPP and have been damaged thereby.

67.     At all times relevant, the market for WPP ADRs was an efficient market for the following reasons, among others:

a)      WPP ADRs was listed and actively traded on the NYSE, a highly efficient and automated market;

b)      As a regulated issuer, WPP filed periodic public reports with the SEC and/or the NYSE;

c)      WPP regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)      WPP was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

68.     As a result of the foregoing, the market for WPP ADRs promptly digested current information regarding WPP from all publicly available sources and reflected such information in

the price of WPP ADRs.  Under these circumstances, all purchasers of WPP ADRs during the Class Period suffered similar injury through their purchase of ADRs at artificially inflated prices, and a presumption of reliance applies.

69.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of WPP ADRs; and (iii) cause Plaintiff and other members of the Class to purchase

WPP ADRs at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

72.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for WPP ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

73.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about WPP's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of WPP's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about WPP and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's ADRs during the Class Period.

74.    Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

75.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing WPP's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its ADRs.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of WPP ADRs was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the ADRs traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased WPP ADRs during the Class Period at artificially inflated prices and were damaged thereby.

77.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that WPP was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased WPP ADRs, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

78.     By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## **COUNT II**

### **For Violations of Section 20(a) of the Exchange Act**
### **Against All Individual Defendants**

80.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

81.    The Individual Defendants acted as controlling persons of WPP within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.    As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## PRAYER FOR RELIEF

84.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)   Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)   Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)   Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)   Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

85.   Plaintiff demands a trial by jury.

Dated: November 28, 2025                    Respectfully submitted,

By: */s/ Marco A. Dueñas*
**SAXENA WHITE P.A.**
Marco A. Dueñas
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
mduenas@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Plaintiff Teamsters Local 456 Annuity Fund*